AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>Information associated with 100024693937752,<br>100003842654593, and 100051153371408 stored at<br>premises controlled by Meta Platforms, Inc. | )<br>)<br>)<br>)<br>)<br>)    Case No. 23-ML-637 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| See Attached Affidavit in<br>Support of Search Warrant | |

The application is based on these facts:

See Attached Affidavit in Support of Search Warrant

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
/s/ Joshua Udy
*Applicant's signature*

Joshua Udy, Supervisory Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date: _____ 04/04/2023 _____

_____
*Judge's signature*

City and state: _____ Washington, D.C. _____          Robert B. Collings, United States Magistrate Judge
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means        ☐ Original        ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>Information associated with 100024693937752,<br>100003842654593, and 100051153371408 stored at<br>premises controlled by Meta Platforms, Inc. | )<br>)<br>)    Case No.  23-ML-637<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Northern _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference

**YOU ARE COMMANDED** to execute this warrant on or before _____ April 18, 2023 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to    Robert B. Collings, United States Magistrate Judge    .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____        _____
                                                                                        *Judge's signature*

City and state:        Washington, D.C.        Robert B. Collings, United States Magistrate Judge
                                                                                        *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br> 23-ML-637 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information associated with Facebook accounts

**100024693937752**, **100003842654593** and **100051153371408** that are stored at premises owned,

maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo

Park, California.

2

**ATTACHMENT B**
**Particular Things to be Seized and Procedures**
**to Facilitate Execution of the Warrant**

I.      **Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

a.   For the time period from November 20, 2020 to and including November 21, 2020: The contents of any available messages or other communication associated with the Account (including, but not limited to, messages, attachments, draft messages, posts, chats, video calling history, "friend" requests, discussions, recordings, images, or communications of any kind sent to and from the Account, including stored or preserved copies thereof), and related transactional records for all PROVIDER services used by an Account subscriber/user, including the source and destination addresses and all Internet Protocol ("IP") addresses associated with each message or other communication, the date and time at which each message or other communication was sent, and the size and length of each message or other communication;

b.   For the time period from November 20, 2020 to and including November 21, 2020: All photos and videos uploaded by the Account and all photos or videos uploaded in

which the Account has been "tagged", including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

c.  For the time period from November 20, 2020 to and including November 21, 2020: All records or other information related to the Account, including address books; contact and "Follower" lists (including related sync information); "close friends" lists; calendar data; profile information (including past and current bios and profiles); rejected "Follower" requests; blocked, unblocked, muted, and restricted users; status updates; comments; "tags"; the account's usage of the "like" feature, including all posts and content that the user has "liked"; and searches performed by the Account;

d.  Basic subscriber records and login history, including all records or other information regarding the identification of the Account, to include full name, physical address, telephone numbers, birthdate, security questions and passwords, and other personal identifying information, records of session times and durations, the date on which the Account was created, the length of service, types of services utilized by the Account, the IP address used to register the Account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, means and source of payment (including any credit or bank account number), and any account(s) linked by machine cookies (meaning all Facebook user identification numbers ("user IDs") that logged into Facebook by the same machine as the Account;

e.  All records or other information related to the Account, including address books, contact and "friend" lists, calendar data, and files; profile information; "News Feed" information; "Wall" postings; Notes; groups and networks of which the Account is a

member; future and past event postings; rejected "friend" requests and blocked users; status updates (including relationship status updates); comments; gifts; "pokes"; "tags"; the account's usage of the "like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked"; searches performed by the Account; privacy settings, including privacy settings for individual Facebook posts and activities; information about the Account's access and use of Facebook applications; and the Account's access and use of Facebook Marketplace;

f.   For the time period from November 20, 2020 to and including November 21, 2020: All "check ins" and other location information;

g.   For the time period from November 20, 2020 to and including November 21, 2020: All records pertaining to communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

h.   All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s);

i.   All information held by PROVIDER related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account

(including those collected for non-PROVIDER based applications), IP addresses,
Global Positioning System ("GPS") information, and information pertaining to
nearby devices, Wi-Fi access points, and cell towers; and

j.    Information about any complaint, alert, or other indication of malware, fraud, or
terms of service violation related to the Account or associated user(s), including any
memoranda, correspondence, investigation files, or records of meetings or discussions
about the Account or associated user(s) (but not including confidential
communications with legal counsel).

Within 14 days of the service of this warrant, PROVIDER shall deliver the information
set forth above via United States mail or courier to:  Supervisory Special Agent Miguel Perez,
Federal Bureau of Investigation, J. Edgar Hoover Building, MLAT Unit, Room 7848, 935
Pennsylvania Avenue, NW, Washington, D.C. 20535-0001, or via e-mail to
HQ_ISP_MLAT_Returns@FBI.gov. PROVIDER is specifically authorized to transmit or send
the information specified below to the Federal Bureau of Investigation anywhere in the United
States, including, but not limited to, Washington, D.C.

**II.      Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of criminal laws of Romania, specifically Article 188 of the Romanian Criminal Code, regarding Murder, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a)      Information that constitutes evidence of the identification of the user(s) of the Account;

(b)      Information that constitutes indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c)      Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d)      Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e)      Information that constitutes evidence of any communication between the Suspects, or between the Suspects and other individuals about the criminal activity under investigation;

(f)      Information that constitutes evidence of any photographs, video, or other content depicting, or related to, the criminal activity under investigation; and

(g)     Information that constitutes evidence of concealing or attempting to conceal evidence relevant to the investigation.

### III.      Government procedures for warrant execution

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States and shared with appropriate foreign authorities.

Law enforcement personnel will then seal any information from PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THREE FACEBOOK ACCOUNTS THAT ARE STORED AT PREMISES CONTROLLED BY META PLATFORMS, INC.** | Case No. ___23-ML-637_____ <br><br> **Filed Under Seal** |

*Reference:    DOJ Ref.# CRM-182-83235; Subject Accounts: 100024693937752; 100003842654593; 100051153371408*

**AFFIDAVIT IN SUPPORT OF
<u>AN APPLICATION FOR A SEARCH WARRANT</u>**

I, Joshua Udy, being first duly sworn, hereby depose and state as follows:

**<u>INTRODUCTION AND AGENT BACKGROUND</u>**

1.      I make this affidavit in support of an application for a search warrant for information associated with three Facebook accounts – that is, **100024693937752**, **100003842654593** and **100051153371408** – that are stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A), and 3512(a), to require PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.     The information requested in this search warrant is being sought pursuant to a request for assistance ("Request") from the Ministry of Justice of Romania, transmitted to Washington, D.C. Authorities in the Romania are prosecuting Adrian Bila ("BILA") and Raul Pasula ("PASULA") for homicide, which occurred on November 20, 2020, in violation of the criminal law of Romania, specifically, Article 188 of the Romanian Criminal Code.  This Request is made pursuant to the Treaty Between the Government of the United States of America and the Government of Romania on Mutual Legal Assistance in Criminal Matters, Rom.-U.S., May 26, 1999, S. TREATY DOC. NO. 106-20 (2000) (hereinafter, the "Treaty"), as supplemented by the Extradition Treaty Between the United States of America and Romania and the Protocol to the Treaty Between the United States of America and Romania on Mutual Legal Assistance in Criminal Matters, Rom.-U.S., September 10, 2007, S. TREATY DOC. NO. 110-11 (2008) (hereinafter, the "Protocol").  Under the Treaty and Protocol, the United States is obligated to render assistance in response to the request.

3.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since 2017.  I am currently assigned to the International Operations Division, Mutual Legal Assistance Treaty Unit, in Washington, D.C.  My current duties include responding to requests from foreign governments pursuant to mutual legal assistance treaties, including serving as the affiant on search warrant affidavits, serving search warrants, and reviewing the data received in response thereto for relevance in compliance with the parameters of the search warrants.  During my employment with the FBI, I have conducted investigations related to numerous white collar investigations.  I have experience in the execution of search warrants and the analysis of collected evidence.  Additionally, I have received training in the operation of computers and the collection and handling of digital evidence.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of the criminal laws of Romania have been committed by BILA and PASULA.  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes, as described in Attachment B.

## PROBABLE CAUSE

6.      According to Romanian authorities, on November 20, 2020, at around 10:00 p.m. (UTC +2), BILA and PASULA physically assaulted a man ("the Victim") in Romania.  The Victim later died as a result.  At BILA's request, his brother, Catalin Bila ("CATALIN"), recorded a video of the assault on his mobile phone.   The video was later shared among CATALIN, BILA, PASULA, and at least one other individual via Facebook Messenger.

7.      When questioned by Romanian authorities, BILA admitted to punching the Victim several times on the night of the attack.   BILA stated that, on the evening of November 20, 2020, his father arrived home with three men, one of whom was the Victim.  All four men were visibly drunk.   BILA wanted the three drunken guests to leave the house.  He intended to get the guests "out by force[.]"   He admitted to telling CATALIN to record a video of the attack on CATALIN's mobile phone.

8.      According to BILA, CATALIN sent him the video shortly after the attack, which BILA then sent from his Facebook account **100024693937752** to PASULA's Facebook account

**100051153371408**.  BILA also admitted sending the video to his girlfriend at the time, Witness-1, but told authorities that he deleted the message from Facebook almost immediately after sending the video.  Witness-1 corroborated that BILA sent her the video but said that she also deleted the video and conversations shortly after it was sent.

9.      Romanian authorities also questioned PASULA.   PASULA told Romanian authorities that on the night of the attack, he was with a friend who also knew BILA.   BILA called and asked the mutual friend to come to his house to make fun of the people "getting drunk there."   PASULA drove with his friend to the house.   PASULA admitted to punching at least one person during the attack, stating that he "did the same" as the others.   On the night of the attack, CATALIN sent the video of the assault to PASULA's Facebook account **100051153371408.**

10.     When questioned by Romanian authorities, CATALIN said, "the duration of the entire video was around thirty seconds."  He admitted to sending the video from his Facebook account **100003842654593** to BILA's Facebook account **100024693937752**.

11.     Romanian authorities forensically examined CATALIN's mobile phone, which he used to record the attack.  They discovered that he had deleted the video from his phone. However, they determined that CATALIN sent the video from his Facebook account **100003842654593** to PASULA's Facebook account **100051153371408**, on November 20, 2020, at around 10:37:32 p.m. (UTC +2).  CATALIN also sent the video from his Facebook account **100003842654593** to another Facebook user on November 20, 2020, at around 10:37:36 (UTC +2).

12.     During the forensic examination of the aforementioned mobile phones, Romanian

4

authorities obtained fragments of the video but could not retrieve the full video.

13.     In response to a previous Order issued pursuant to 18 U.S.C. § 2703(d),[1]

PROVIDER produced transactional records from accounts **100024693937752**,

**100003842654593**, and **100051153371408**.  These records show a message on November 20,

2020 at 20:37:32 UTC from CATALIN's Facebook account **100003842654593** to PASULA's

Facebook account **100051153371408**.  The records do not indicate the nature of the message or

any content associated with it.

14.     The records also show a message on November 20, 2020 at 20:37:36 UTC from

CATALIN's Facebook account **100003842654593** to another Facebook user.

15.     These records are consistent with what Romanian authorities observed on

CATALIN's phone regarding when CATALIN sent the video.

16.     Further, records for BILA's Facebook account, **100024693937752**, show no

contact with Witness-1 on November 20, 2020 from 18:48:03 UTC to 19:55:24 UTC.  However,

beginning at 19:55:24 UTC, and continuing for approximately one hour, BILA and Witness-1

exchanged over one hundred messages.  Although some of these messages were removed by

BILA, most of them appear to be still available.

17.     The Facebook accounts **100024693937752**, **100051153371408**, and

**100003842654593** are serviced by PROVIDER.  As a result, Romanian authorities seek content

records from PROVIDER to further their investigation.

### BACKGROUND CONCERNING PROVIDER'S ACCOUNTS

---

[1] *See* Order, In Re Application of USA Pursuant to 18 U.S.C. 3512 for 2703(d) Order for Three
Facebook Accounts Serviced by Meta Platforms, Inc., No. 22-ML-935 (D.D.C. Aug. 29, 2022).

18.     Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com.  Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

19.     Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Each Facebook user is assigned a user identification number and can choose a username.

20.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

21.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these

6

privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

22.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

23.     Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes.  Users can "tag" other users in a photo or video, and can be tagged by others.  When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

24.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, video.  Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats. of the date of each call.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

25.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

26.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

27.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

28.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

29.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

30.     In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

31.     Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform.  For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

32. Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

33. Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

34. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as

9

described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

35.     Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

36.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant.  I submit that OIA Trial Attorney Rachel Bohlen, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

10

## **CONCLUSION**

37.      Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

/s/ Joshua Udy
_____
Joshua Udy
Special Agent
Federal Bureau of Investigation


Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on

_____
Robert B. Collings
UNITED STATES MAGISTRATE JUDGE

## **Relevant Provision of Romanian Criminal Code**

**Article 188 - Murder**

1. Murdering an individual shall be punishable by no less than ten and no more than twenty

   years of imprisonment and a ban on the exercise of certain rights.

2. The attempt shall also be punishable.